CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

IVANA DJAK (NYBN 5516687)
Assistant United States Attorney

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3918
FAX: (510) 637-3724
ivana.djak@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KAWAN HARDY,<br><br>Defendant. | CASE NO. 26-CR-271 JST<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Date: August 11, 2026<br>Time: 9:30 a.m.<br>Judge: Hon. Jon. S. Tigar |

**INTRODUCTION**

On January 23, 2026, Defendant Kawan Hardy, a convicted felon with a considerable criminal history—including several prior convictions for being a felon-in-possession-of-a-firearm—was at the scene of a shooting near two schools and possessed ammunition. Specifically, at about 11:15 p.m., the Defendant was present at the scene of a shooting that occurred in the parking lot of the Bottles & Liquor Market located on Market Street in Oakland, California. He possessed a .40 caliber firearm and .40 caliber Smith & Wesson ammunition at the time of the shooting. The ammunition was later recovered by Oakland Police Department Officers at the scene of the shooting.

As part of a violent crime reduction initiative in Oakland, the Defendant was charged with and ultimately pleaded guilty to being a felon in possession of ammunition, in violation of 18 U.S.C.

§ 922(g)(1). For the reasons set forth below, the government requests that the Court sentence Defendant to 54 months of imprisonment, a three-year term of supervised release, with the conditions recommended by probation and set forth in the plea agreement, and a $100 special assessment.

## BACKGROUND

### I. The Illegal Possession of Firearms Poses an Unacceptable Danger to Oakland

The relevant conduct in this case is described below, but the Defendant's conduct in this case did not occur in a vacuum. Rather, the Defendant's illegal possession of a firearm helps to fuel the wave of gun violence that is and has been ravaging Oakland. The proliferation of illegal firearms amplifies the issue of violent crime, as robberies, burglaries, domestic violence incidents, or even routine altercations like road rage incidents, carry the potential to become deadly when the participants are armed. Illegal firearms are also central to the challenge of gang violence, with groups of young armed people too often turning residential neighborhoods into combat zones. Although the rate of shootings has fallen from its peak in 2023, the number of shootings and gun-related murders remains unacceptably high.

Harrowing statistics underscore the damage illegal firearms inflict on Oakland. In 2025, the city suffered 67 homicides, at a rate of 15 homicides per 100k residents. This homicide rate is *five times* the rate of San Francisco, and also substantially higher than neighboring cities in Berkeley and San Leandro.




| City | 2025 Population | Homicides 2025 | Homicides (per 100k) |
|---|---|---|---|
| *Oakland* | *444,196* | *67* | *15* |
| SF | 826,079 | 28 | 3 |
| Los Angeles | 3,874,000 | 230 | 6 |
| Berkeley | 123,195 | 1 | 0.8 |
| San Leandro | 86,587 | 3 | 3.5 |
| San Jose | 993,000 | 24 | 2.4 |

It is not a mystery why Oakland has suffered so many more homicides than its neighbors. It is because of illegal firearms. Of the 67 homicides in 2025, 65 of them were committed with a firearm, and only 2 involved some other means. Indeed, as part of the violent crime reduction initiative, one of the other defendants charged—not Hardy—had engaged in a shootout in a crowded downtown Oakland nightclub in the early morning of March 7, 2026, in which two people were killed—including a schoolteacher who was shot as she attempted to run from the gunfire—and at least five others also suffered gunshot wounds during the incident. *See United States v. Jarvis Toussaint*, Case No. 4:26-cr-00235-JSW, Dkt. 1.

And the problem is not limited to murders. There were 350 individuals who were shot in 2025, many suffering gruesome injuries with lifelong impacts. 2025 also saw 1,674 robberies and 2,950 aggravated assaults in 2025. As with homicides, Oakland suffers robbery and aggravated assaults at a much higher rate when compared with its neighbors. And a substantial portion of these violent crimes also involved firearms. Indeed, these violent confrontations, when mixed with illegally possessed firearms, all too often escalate into a shooting or a murder.

Nor has the problem abated in 2026. Through only the first quarter of 2026, Oakland had already suffered 13 homicides, 374 robberies (102 involving firearms), 588 aggravated assaults, and 53 assaults with a firearm (including shootings and injuries by firearms). These statistics are staggering.

This is also not a problem that is limited to people already involved in criminal activity. Every resident of Oakland is made less safe by these illegal guns. Innocent bystanders uninvolved in criminal activity have been maimed and killed. For example, in 2021, an almost two-year old boy was shot and killed in his car seat in his family vehicle when gang members engaged in a shootout on I-880 in Oakland. And, as described above, in March 2026, an innocent 33-year-old middle school teacher was murdered at a mass shooting at a night club in Oakland.

These tragedies and grim statistics are astounding, and they are unacceptable. Oakland has suffered enough. The proliferation of illegal firearms is not a trivial matter, but a direct threat to the safety of the community. The Defendant's offense, particularly the repetitive nature of him illegally possessing a firearm, is grave and must be set against this context of a culture of violence in Oakland that must be disrupted.

## II. Offense Conduct – A Shooting at Bottles & Liquor Market in Oakland

On January 23, 2026, a shooting occurred in the parking lot of the Bottles & Liquor Market. Based on surveillance footage, at approximately 11:14 p.m., two individuals walked up to Bottles & Liquor Market from the direction of 12th St. Presentence Investigation Report ("PSR") ¶ 8. One of the individuals, Subject 1, was subsequently identified as Jamonn Blincoe. The second individual, Subject 2, was subsequently identified as Karwan Hardy. Hardy entered the liquor store while Blincoe stood outside of the store at the entrance. *Id.*

At approximately, 11:15 p.m., a dark sedan, traveling southbound on Market St., with its headlights off, passed the liquor store. Blincoe, who was standing outside of the store at the entrance, turned toward and looked at the sedan as it passed by and immediately placed his hand inside the front pocket of his hooded sweatshirt. *Id.* ¶ 9. Blincoe looked around, looked in the direction of the dark sedan, and then turned and looked inside of the store and appeared to call out to Hardy, before making a quick jerking movement with his head signaling Hardy to exit the store. Hardy then quickly exited the store. Both men then walked southbound on Market Street in the direction of travel of the dark sedan. Hardy also had his hand inside the front pocket of his hooded sweatshirt. *Id.*

While Hardy and Blincoe were walking southbound on Market Street, two unknown females began fighting in the parking lot of the Bottles and Liquor store. Hardy and Blincoe walked back to where the women were fighting. *Id.* ¶ 10. Then at approximately 11:16 p.m., less than two minutes after the dark sedan passed by the liquor store, all the individuals in the parking lot of the store were seen suddenly reacting in a manner consistent with hearing gunfire, including abrupt, rapid movements and quickly changing direction. *Id.* Unknown individuals shot in the direction of Hardy and Blincoe and where the two women were fighting. Hardy and Blincoe are visible on surveillance video ducking for cover and pulling out firearms. The firearms held by both Hardy and Blincoe are visible in the surveillance videos. Hardy and Blincoe are visible stretching out their arms and firing shots eastbound

down 12th St. from their firearms. In the surveillance video, muzzle flashes were observed coming from both Hardy and Blincoe's firearms. *Id.*

Hardy and Blincoe then quickly fled the liquor store parking lot, heading east on 12th Street, out of view of the cameras. Shortly after they fled eastbound, a dark colored Honda sedan drove westbound on 12th St. It was the first vehicle to leave the scene immediately after the shooting. PSR ¶ 11.

OPD patrol officers responded to the scene of the shooting. Officers canvassed the scene and located twenty-six spent .40 caliber S&W casings. An Integrated Ballistics Identification System (IBIS) test was conducted of the casings recovered and it revealed that the shells all came from two .40 caliber firearms. *Id.* ¶ 12. IBIS testing is ballistic testing process that creates high-resolution 3D digital images of ammunition casings and bullets.

OPD investigators and probation officers subsequently identified Hardy and Blincoe based on the surveillance footage. *Id.* ¶ 13. Furthermore, a vehicle records check was conducted on Blincoe and determined that at the time of the shooting, a grey 2025 Honda Accord, California license plate ending in H300 was leased to him. *Id.* A records check for the Honda's license plate revealed that it was located in San Francisco approximately 10 minutes after the shooting, which is roughly the amount of time it would take for a vehicle traveling at a high rate of speed to travel from Bottles & Liquor Market to San Francisco. *Id.*

The next day, on January 24, 2026, OPD officers located the Honda in Oakland at a towing company. The Honda had bullet holes in it. PSR ¶ 13. Cell phone location data also placed Hardy at the scene of the shooting. *Id.* ¶ 14.

On February 4, 2026, Blincoe was arrested by OPD officers for the shooting incident. His residence was searched pursuant to a warrant and further ammunition was found. *Id.* ¶ 15. On February 10, 2026, Hardy was arrested in Antioch, California by OPD officers for the shooting incident. *Id.* ¶ 16.

Bottles & Liquor Market is located across the street from Martin Luther King Jr Elementary School, which is located at on 10th St., Oakland, and West Oakland Middle school, located at on 14th St., Oakland. Because the parking lot of the liquor store is less than 1,000 feet away from the elementary school and the middle school, this shooting occurred within a school zone. PSR ¶ 8.

## III. Criminal History

The Defendant has a lengthy criminal history. In January 2012, he incurred a misdemeanor conviction for possessing a concealed firearm. In October 2012, he incurred a felony conviction for carrying a loaded firearm. He was sentenced to 210 days' jail and three years' probation. In September 2013, he was convicted of being a felon in possession of a firearm. He was sentenced to 120 days' jail and five years' probation. In June 2014, he incurred a federal felon in possession conviction and was sentenced to 24 months in custody and three years' supervised release. *See* Case No. 14-CR-44 YGR. In November 2017, his supervised release was revoked, and he was sentenced to one year in custody and 21 months' supervised release. In May 2018, he was convicted of being a felon in possession of a firearm and sentenced to a year in jail and 24 months' probation. In August 2019, the Defendant was convicted for shooting at an inhabited dwelling and being a felon in possession. He was sentenced to 26 years in prison but was later paroled. In November 2023, the Defendant's federal supervision was again revoked, he was sentenced to time served, and 18 months' supervised release. PSR ¶¶ 37–43.

## IV. Procedural Posture

On March 24, 2026, the government charged Hardy and Blincoe in a two-count criminal Complaint with violations of 18 U.S.C. § 922(g)(1) – Felon in Possession of a Firearm, and 18 U.S.C. §922(q)(2)(a) – Possessing a Firearm in a School Zone. Dkt. No. 1. On June 1, 2026, the Defendant was charged in a one-count Information with being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). Dkt. No. 24. On June 12, 2026, the Defendant pled guilty to Count One of the Information pursuant to a plea agreement. Dkt. Nos. 30, 31. Sentencing is set for September 11, 2026.

# ARGUMENT

## I. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include (among other factors):

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## II. Sentencing Guidelines Calculation

As set forth in the PSR and the plea agreement, the Sentencing Guidelines calculations for Defendants offense level is as follows:

| | U.S.S.G. Section | Level/Points |
|---|---|---|
| Base offense level | § 2K2.1(a)(2) –possession of ammunition subsequent to two felony convictions | 24 |
| Specific offense characteristics | § 2K2.1(b)(7)(B) – in connection with another felony offense | +4 |
| Acceptance of responsibility | § 3E1.1 | -3 |
| Total offense level | | 25 |

PSR ¶¶ 23–32.

The Probation Officer concluded that Defendant's criminal history score is 8, and he therefore falls into Criminal History Category IV. PSR ¶ 45. As reflected in the PSR, the Guidelines range for imprisonment associated with adjusted offense level 25 and Criminal History Category IV is 84 – 105 months of incarceration. *Id.* ¶ 91. The Probation Officer recommends a 48-month sentence. *Id.* at Sentencing Recommendation.

In accordance with the plea agreement, the government recommends 35 perfect below the low end of the range associated with the Guidelines calculation set out above, specifically, 54 months in custody, to be followed by three years of supervised release.

**III. The United States' Sentencing Recommendation**

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends a custodial sentence of 54 months imprisonment——to be followed by a three-year term of supervised release. This sentence accounts for a 35 percent downward variance from the advisory guideline range. *Id.* Consistent with 18 U.S.C. § 3553(a), such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense and to provide deterrence, but also to account for relevant mitigating factors.

As discussed above, gun violence has plagued Oakland for far too long. In an effort to tackle this problem, beginning in March 2026, federal and local law enforcement coordinated efforts in a surge of federal firearm enforcement measures in Oakland and the East Bay that resulted in the seizure of 76 illegally possessed firearms and charges against 51 defendants. The Defendant possessed a loaded gun and fired shots in a public place, a school zone no less.

The government's recommended sentence in this case therefore plays a key role in its efforts to disrupt the cycle of gun violence in the East Bay by deterring the Defendant from yet again possessing dangerous guns once released, and others like the Defendant who continue to threaten the safety of the East Bay community by illegally possessing firearms. This, in turn, reflects the need for the sentence to promote respect for the law and afford general deterrence. *See* U.S.S.G. § 3553(a)(1), (a)(2)(A)–(B).

In addition, for characteristics of the Defendant, specific deterrence, and to protect the public from further crimes of the defendant, it is notable that the Defendant has incurred multiple firearms convictions, in addition to interim additional convictions leading to violations of supervised release and

additional federal prison terms. *See* U.S.S.G. § 3553(a)(2)(C)–(D). He was previously sentenced to multiple substantial prison terms, including to one term of 26 years from which he was ultimately paroled. Those prior convictions and sentences did not deter him from again possessing a firearm and ammunition, and from engaging in a shooting. A significant sentence in this case followed by three years of supervised release will hopefully put an end to the Defendant's dangerous criminal misconduct.

On the other hand, the Defendant took early and full responsibility for his criminal misconduct. The government is optimistic that this case will serve as an inflection point for the Defendant. The Defendant has expressed his desire to be a present father for his children—and hopefully after this term, he will be. He cannot continue to engage in behavior that threatens the public and that will result in his continued incarceration. Rather than being a threat to the community, the government is hopeful that its recommended sentence, which includes three years of supervised release after his prison term, will be the impetus for the Defendant to transform himself into a productive member of the community.

**CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence Defendant to 54 months in prison followed by a three-year term of supervised release.

DATED: September 4, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
IVANA DJAK
Assistant United States Attorney